IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL COLEMAN, ROBERT STOCKER, and GRANT WILLIAMS,　　　) ) ) | No. CV-F-03-06707 REC DLB |
| 　　　　　　Plaintiffs,　　） ） | ORDER DISMISSING DOE DEFENDANTS, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DIRECTING CLERK TO ENTER JUDGMENT FOR DEFENDANT. |
| 　　　vs.　　　　　　　） ） | |
| AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA and DOES 1-50, inclusive,　　　　　　） ） ） ） | |
| 　　　　　　Defendants.　） ） ） | (Doc. 26) |

On Monday, October 24, 2005, the Court heard Defendant's motion for summary judgment or summary adjudication.[1]  Upon due consideration of the written and oral arguments of the parties and the record herein, the Court GRANTS Defendant's motion as set forth below.

This case involves an employment dispute arising from Plaintiff employees' resignation from positions with Defendant

---

[1]Because it appears that the only defendant in this action is the Automobile Club of Southern California, the Court dismisses the Doe defendants.

1

employer following a series of changes in their compensation and job description.  Plaintiffs seek recovery on five causes of action:

1. <u>First Cause of Action</u>:  Employment Discrimination under California Government Code section 12940 et seq. (California Fair Employment and Housing Act ("FEHA"));

2. <u>Second Cause of Action</u>:  Employment Discrimination Under 29 U.S.C. section 623 et seq. (Age Discrimination in Employment Act ("ADEA"));

3. <u>Third Cause of Action</u>:  Breach of Implied in Fact Employment Contract;

4. <u>Fourth Cause of Action</u>:  Breach of the Covenant of Good Faith and Fair Dealing;

5. <u>Fifth Cause of Action</u>:  Constructive Discharge.

Defendant moves for summary judgment with respect to each of these causes of action.

**I.   Factual Background**

Plaintiffs Michael Coleman, Robert Stocker, and Grant Williams (collectively "Plaintiffs") worked as district office managers ("DOMs") for Defendant Automobile Club of Southern California ("Defendant" or the "Company").  All three resigned between 1998 and 2002 after working for Defendant for many years. Plaintiff Williams, who began working for Defendant in 1966, resigned in 1998.  Plaintiff Stocker worked for Defendant from 1970 until 2000.  Plaintiff Coleman resigned in 2002 after more than 30 years of employment with Defendant.  All three were over

2

1   the age of 40 when they resigned.

2        In 1994, Defendant undertook to restructure its managerial

3   employees' responsibilities.  Kane Decl. at ¶ 4.  Completed in

4   1996, the reorganization shifted responsibility for supervising

5   sales employees from DOMs to Sales Managers.  Id.  DOMs took on

6   some other responsibilities that they had not previously had,

7   such as overseeing travel operations, which existed in some

8   offices.  Id.  The parties dispute whether the reorganization

9   plan reduced DOMs' responsibilities overall.  The 1995 High

10  Performance Compensation Plan ("1995 Plan") provided for a base

11  salary that was determined with reference to market rates.  A

12  portion of the base salary – 10 percent – was set aside as "at

13  risk" variable pay that was paid out based on individual

14  performance and the success of the organization.  It is

15  undisputed that the 1995 Plan was implemented to create

16  incentives for exceptional performance.  Pls.' Opp'n to UMF No.

17  19.

18       In 1997, Defendant performed a job study (the "1997 Job

19  Study" or the "Study") to determine whether DOMs were receiving a

20  salary higher than others who performed similar jobs in the

21  marketplace.  Plaintiffs dispute the purpose of the Study.  They

22  claim that DOMs had been paid over market rates for some time in

23  order to attract and retain qualified employees, and reducing

24  DOMs' salaries was a foregone conclusion.  Defendant does not

25  dispute that DOMs' pay previously exceeded market rates.

26       Barbara Holland, the lead Human Resources Consultant for

3

Defendant, conducted the Study.  She was 47 years old at the time.[2]  The Study involved a comparison of the salaries of other managerial positions with DOM salary and duty.  The Study concluded that DOMs were paid over market rate based on their duties.  Following the Study, Defendant reduced the market rate for DOM compensation by 12 percent.  This resulted in a lower pay rate for some DOMs.  Plaintiffs contend that the Study was improperly conducted and did not provide adequate grounds to justify the compensation change.

On January 1, 1998, Defendant introduced the 1998 High Performance Compensation Plan (the "1998 Plan").[3]  The 1998 Plan increased the at-risk amount from 10 percent to 15 percent of market rate.  This provided employees increased incentives to perform at a high level.  The parties dispute whether the 1998 Plan applied to all managers, or just to DOMs.  No evidence in the record indicates that anyone but DOMs was affected.

Human Resource Manager Diane Grice led the development and recommendation of the 1998 Plan, along with Brenda Welsh and her consulting group.  Ms. Grice and Ms. Welsh were over 40 years old

_____

[2]Plaintiffs argue that Ms. Holland's age is irrelevant.  The Court finds this fact relevant to rebut Plaintiffs' allegations that Ms. Holland conducted the Study in an age discriminatory fashion.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991).

[3]The parties dispute whether the 1998 Plan arose out of the 1997 Job Study.  Plaintiffs ask the Court to strike a portion of Barbara Holland's declaration wherein she opines that the two were unrelated.  Mot. to Strike at 3.  The Court finds that the causal relationship between the Study and the 1998 Plan is not relevant to its inquiry.

4

1  at the time they developed the plan.

2      In 1998, almost all DOMs were over the age of 40.[4]  This is

3  because becoming a DOM requires skills that could not be obtained

4  without age and seniority.  In 1997, 53 percent of Defendant's

5  approximately 6,000 employees were over 40 years old. Adame Decl.

6  at 1-2.  Today, the portion is 54.5 percent.[5]  Id. at 2.

7      Both parties agree that, of the 63 DOMs employed in 1999, 33

8  experienced reductions in pay under the compensation scheme that

9  resulted from the 1997 Job Study and the 1998 Plan.  Plaintiff

10 Williams resigned in anticipation of a pay cut but before he

11 experienced any adverse effects of the changing compensation

12 structure.  It is undisputed that Plaintiff Coleman's

13 compensation when he resigned was approximately the same as when

14 the 1998 Plan went into effect.  Plaintiff Stocker's salary

15 decreased under the 1998 Plan.  Stocker Decl. at ¶ 15.  No one

16 asked Plaintiffs to resign.  Mot. Ex. A at 40-41; Mot. Ex. C at

17 64, 68; Mot. Ex. D at 8.  Plaintiff Williams was encouraged to

18 reconsider his resignation.  Mot. Ex. C at 68.  Because

19 —————————————————

20     [4]Plaintiffs assert that 62 out of 63 DOMs were over 40.  No
   evidence supporting this assertion appears in the record.
21 Defendant conceded in its motion that DOMs were "almost all over
   the age of 40."  Mot. at 7.  At oral argument, Defendant conceded
22 that "all but one" of the DOMs were over 40.
       [5]Plaintiffs object that these figures are based on
23 inadmissible hearsay.  Human Resources Department Manager Sandi
   Adame arrived at the statistics by reviewing Company personnel
24 records, which Company employees have kept in the ordinary course
   of business.  See Adame Decl. at § 3.  The Court finds that this
25 evidence falls within the business records exception to the hearsay
   rule.  See Sea-Land Serv. v. Lozen Int'l, LLC, 285 F.3d 808, 819
26 (9th Cir. 2002).

5

Plaintiffs' retirement benefits are calculated based on the best five years of salary of the last ten years of employment, they also feared that future decreases in pay would adversely affect the amount of benefits.

After Plaintiffs resigned, other employees assumed their tasks.  Jeff Goldsmith, who was under 40, replaced Plaintiffs Stocker and Coleman.  Sharon Fusco, in her 50s at the time, became DOM of the Porterville office when Plaintiff Williams resigned that position.  Plaintiffs concede that Ms. Fusco took the DOM title, but contend that Kaylene McGuire assumed the duties and responsibilities of Plaintiff Williams.  Williams Decl. at ¶ 8.  Ms. McGuire was 40 years old when Plaintiff Williams resigned on November 1, 1998.  Kane Supp. Decl. at ¶ 3.

**II.   Procedural Background**

Plaintiffs received a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") on September 5, 2003.  On November 26, 2003, Plaintiffs filed suit in this Court.  Defendant filed a motion for summary judgment or summary adjudication, along with a Statement of Undisputed Material Facts ("UMF") and various declarations and exhibits, on September 26, 2005.  Plaintiffs filed an opposition brief, Statement of Disputed Material Facts ("DMF"), and their own declarations and exhibits on October 11, 2005.  Defendant filed its reply on October 17, 2005.

//

//

6

III. Discussion

    A.   Legal Standard

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Materiality is determined by the substantive law governing a claim or a defense. Id. The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party. Id.

The initial burden in a motion for summary judgment is on the moving party. The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden then shifts to the nonmoving party to defeat summary judgment. T.W. Elec., 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific

facts showing there is a genuine issue for trial." <u>Id.</u> (citing Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." <u>Id.</u> (citing <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

**B. Disparate Treatment Age Discrimination**[6]

The Ninth Circuit has summarized the standards for evaluating motions for summary judgment in employment discrimination cases as follows:

> A plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision.  Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

<u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994) (citations and internal quotations omitted); <u>see also</u> <u>Caldwell v. Paramount Unified Sch. Dist.</u>, 41 Cal. App. 4th 189, 197 (1995) (applying same burden shifting procedure under FEHA).

---

[6]The Court interprets Plaintiffs' ADEA and FEHA claims as each containing a discrimination claim under both a disparate treatment theory and a disparate impact theory.  See Opp'n at 14-19.  The Court will combine its discussion of the ADEA and FEHA causes of action under each of these theories because California applies the federal tests for each.  <u>See</u> <u>Caldwell v. Paramount Unified Sch. Dist.</u>, 41 Cal. App. 4th 189, 195 (1995); <u>Carter v. CB Richard Ellis, Inc.</u>, 122 Cal. App. 4th 1313, 1323-24 (2004).

### 1.   Prima Facie Case

To establish a prima facie case of disparate treatment age discrimination, a plaintiff must show that:  (1) he was a member of a protected class, age 40-70; (2) he was performing his job in a satisfactory manner; (3) he was discharged; and (4) he was replaced by a substantially younger employee with equal or inferior qualifications.  Messick v.Horizon Indus., Inc., 62 F.3d 1227, 1229 (9th Cir. 1995) (citing Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420 (9th Cir. 1990)); see also Caldwell, 41 Cal. App. 4th 189, 197 (1995) (same standard for California disparate treatment claim).  The burden on a plaintiff to establish a prima facie case is minimal.  Wallis, 26 F.3d at 889.  The showing "does not even need to rise to the level of a preponderance of the evidence."  Id.

Defendant claims that Plaintiffs cannot meet the first requirement for a prima facie case for disparate treatment because "they cannot identify an employment decision which was intended to affect only a protected class." Mot. at 13.  The Court finds no authority requiring that an employee show direct evidence of an employer's discriminatory intent to make a prima facie case for disparate treatment.  See Messick, 62 F.3d at 1229; Wallis, 26 F.3d at 889 (holding that prima facie case can be established by direct evidence of discriminatory intent or the Rose four-factor test).  Defendant concedes that Plaintiffs were over 40 years old when the new compensation structure was implemented.  Mot. at 12.  Therefore, for purposes of making a

1   prima facie case, Plaintiffs are members of the protected class.

2        Defendant also disputes that Plaintiffs were replaced by

3   substantially younger employees.  Defendant claims that

4   Plaintiffs' duties were assumed by two DOMs who were both over 50

5   years old when Plaintiffs resigned.  Kane Decl. at ¶ 17.  Linda

6   Heald was 50 years old when she took over DOM duties for Bishop

7   and Bakersfield offices.  Id.  The Company combined the Visalia

8   and Porterville offices under Sharon Fusco, who was in her 50s at

9   the time.  Id.  Plaintiffs contend that Jeff Goldsmith, who is

10  under 40 years of age, not Linda Heald, replaced Plaintiffs

11  Coleman and Stocker.  Coleman Decl. at ¶ 10.  In its reply brief,

12  Defendant concedes that Plaintiffs Stocker and Coleman were

13  initially replaced by Mr. Goldsmith.  Reply at 3.  Plaintiffs

14  Stocker and Coleman have created a genuine issue as to whether

15  they were replaced by younger employees and, therefore, made a

16  prima facie case of disparate treatment discrimination.

17       Plaintiffs concede that the title of "District Office

18  Manager," that Plaintiff Williams previously held, went to Ms.

19  Fusco.  Opp'n to Def.'s UMF No. 35.  Plaintiffs assert that

20  Kaylene McGuire, whom Plaintiff Williams "believe[s]" was under

21  the age of 40, assumed his "duties and responsibilities."

22  Williams Decl. at ¶ 8.  In an affidavit submitted with the reply

23  brief, Defendant's Vice President of District Office Operations,

24  Robert Kane, avers that Ms. McGuire was 40 years old when

25  Plaintiff Williams resigned on November 1, 1998.  Kane Supp.

26  Decl. at ¶ 3.  Plaintiffs do not cite to any portion of the

                                   10

1   record where Williams's exact age appears.  See <u>Carmen v. S.F.</u>

2   <u>Unified School Dist.</u>, 237 F.3d 1026, 1029 (9th Cir. 2001)

3   (holding that a district court is "not required to comb the

4   record" for facts opposing summary judgment).  Because the Court

5   is merely told that Plaintiff Williams is over 40 years old, the

6   Court cannot determine whether he is substantially older than Ms.

7   McGuire.  Therefore, Plaintiff Williams has not established a

8   prima facie case for disparate treatment as a matter of law.

9            **2.   Defendant's Legitimate, Nondiscriminatory Reasons**

10       Once a plaintiff has established a prima facie case, the

11  burden shifts to the defendant to articulate a "legitimate,

12  nondiscriminatory reason" for terminating plaintiff.  <u>Cordova v.</u>

13  <u>State Farm Ins. Cos.</u>, 124 F.3d 1145, 1148 (9th Cir. 1997).

14  Defendant claims that the changes in Plaintiffs' responsibilities

15  and compensation were based solely on business considerations.

16  In 1994, Defendant restructured its sales force, which resulted

17  in a change in DOMs' duties.  The 1995 Plan allocated 10 percent

18  of market rate value to variable pay.  Pls.' Opp'n to UMF No. 19.

19  Plaintiffs admit that this was done "to create corporate

20  performance objectives and standards and reward exceptional

21  performance."  <u>Id.</u>

22       Defendant commissioned the 1997 Job Study to determine

23  whether DOM compensation was appropriate given the change in

24  duties.  The Study indicated that DOMs were being overcompensated

25  //

26  //

1  for their duties.  Holland Decl. at ¶ 4.[7]  Based on these

2  findings, Defendant implemented new lower market rates.  Kane

3  Decl. at ¶ 6.  The 1998 Plan put 15 percent, instead of 10

4  percent, of DOMs' salary at risk.  Kane Decl. at ¶ 9.  Defendant

5  asserts it implemented this change to encourage performance.[8]

6  Id.  The Court finds that Defendant has provided a facially

7  nondiscriminatory reason for each of the actions to which

8  Plaintiffs object.

9  ### 3.  Plaintiffs' Showing of Pretext

10     When a defendant has put forth a nondiscriminatory reason,

11  the burden shifts to the plaintiff to (1) present direct evidence

12  of discrimination or (2) present evidence that the defendant's

13  nondiscriminatory explanation is a pretext for a discriminatory

14  motive.  See McDonnell Douglas v. Green, 411 U.S. 792, 802-805,

15  93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Plaintiffs do not put

16  forth any direct evidence, such as discriminatory statements or

17  admissions, that Defendant made its decisions based on age.

18  _____

19  [7]Plaintiffs object that Ms. Holland's declaration "lacks
   foundation" regarding her compensation determinations and is

20  therefore hearsay.  Pls.' Opp'n to UMF No. 16.  Ms. Holland's
   testimony is nonhearsay because it is offered here for its effect

21  on the hearer:  it gave Defendant reason to believe that DOMs were
   overpaid.  See, e.g., Weller v. Titanium Metals Corp., 361 F. Supp.

22  2d 712, 722 n. 10 (S.D. Ohio 2005) (admitting testimony of employer
   that he relied upon other employees' evaluations to judge
   plaintiff's performance).

23  [8]Mr. Kane's affidavit contains his opinion that the
   restructuring and compensation changes have been economically

24  successful.  Plaintiffs object that Mr. Kane's testimony should be
   stricken because they are unsupported opinions that lack

25  foundation.  In any event, the Court finds the actual success or
   failure of the changes irrelevant to determining why Defendant

26  implemented them.

1    Plaintiffs undertake to show that Defendant's explanation of

2   its employment actions is pretextual.  To defeat summary

3   judgment, a plaintiff must tender a genuine issue of fact by

4   producing "specific, substantial evidence of pretext." <u>Wallis</u>, 2

5   F.3d at 890.  The mere existence of a minimal prima facie case

6   does not preclude summary judgment.  <u>Id.</u>  To show disparate

7   treatment, "[p]roof of discriminatory motive is critical,

8   although it can in some cases be inferred from the mere fact of

9   differences in treatment." <u>Hazen Paper Co. v. Biggins</u>, 507 U.S.

10  604, 609 (1993).  The important prohibition is that an employer

11  not base a personnel decision on "inaccurate and stigmatizing

12  stereotypes," such as a belief that productivity and competence

13  decline with age.  <u>Id.</u> at 610.

14   Plaintiffs' burden for showing pretext is enhanced in this

15  case because the decision makers responsible for the compensation

16  changes are also in the protected class.  <u>See</u> <u>Elrod v. Sears,</u>

17  <u>Roebuck & Co.</u>, 939 F.2d 1466, 1471 (11th Cir. 1991) (holding that

18  ADEA plaintiff faced a "difficult burden" where all three

19  decision makers were over 40 because members of the protected

20  class under ADEA "are more likely to be the victim of age

21  discrimination than its perpetrators").  It is undisputed that

22  the personnel who led the restructuring of the sales force in the

23  mid-1990s, conducted the 1997 Study, and who were primarily

24  responsible for designing the 1998 Plan were all over 40 years

25  old.  Pls.' Opp'n to UMF Nos. 18, 34.

26   Plaintiffs argue that the 1997 Job Study was an

13

inappropriate method of determining whether DOMs were overcompensated.  They further allege that it did not adhere to previously established standards for conducting such studies. They claim that the Study was inappropriate to determine whether DOM salaries exceeded market rates.  Plaintiffs claim that, in fact, Defendant knew even before it conducted the Study that it paid DOMs more than market rate for the purpose of attracting and retaining capable employees.  They also claim that the Study was unnecessary because changes in DOM duties that resulted from the 1994 alignment did not amount to a reduction in duties.[9]

This Court does not

> sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Elrod, 939 F.2d at 1470; see also Phipps v. Gary Drilling Co., 722 F. Supp. 615, 620 (E.D. Cal. 1989) ("A court therefore will not re-evaluate business decisions made in good faith, even though they have some negative impact on age-protected individuals, and will not 'second guess' an employer's business judgments in an effort to find some possible violation of the

---

[9]Plaintiffs urge the Court to strike certain portions of Ms. Holland's affidavit that contain what they call her "opinion of her work."  Mot. to Strike at 2-3.  Because the Court's decision to grant summary judgment does not depend on these statements, the Court need not decide whether to strike them.

14

Act." (quoting <u>Bechold v. I.G.W. Systems, Inc.</u>, 817 F.2d 1282 (7th Cir. 1987)).  In <u>Elrod</u>, the employer claimed it fired plaintiff employee for a nondiscriminatory reason:  he had sexually harassed fellow employees.  939 F.2d at 1470.  Even if the sources of this information "were lying through their teeth," the only relevant inquiry would be that the employer in good faith believed the allegations.  <u>Id.</u>  Plaintiff's claim could not succeed because he did not show that the employer's "asserted belief in those allegations was unworthy of credence."  <u>Id.</u> at 1471.

Plaintiffs have presented no evidence from which the Court can infer that Defendant's decision to lower DOMs' market rate was not based on its belief that they were overpaid, but rather on "inaccurate and stigmatizing stereotypes."  Even if Defendant knew in advance that DOMs were overpaid, it could still undertake the Study for the purpose of determining the amount of overpayment, or for the purpose of forestalling a discrimination lawsuit by creating a verifiable objective basis for its actions toward a group containing protected individuals.

In attacking the Study and the resulting compensation changes, Plaintiffs emphasize that DOMs are almost all over 40 years old.  They attempt to infer from this fact that age was likely the motivation for undertaking the Study and the resulting pay restructuring.  The Supreme Court has refused, however, to find disparate treatment where a factor other that age motivated the employment decision.  <u>Hazen Paper</u>, 507 U.S. at 609.  The high

court has further warned, albeit in the context of a disparate

impact rather than disparate treatment challenge, that the

concentration of protected employees in one job category is an

improper manner of establishing discrimination.  <u>Wards Cove</u>

<u>Packing Co. v. Atonio</u>, 490 U.S. 642, 652 (1989), <u>superseded by</u>

<u>statute on other grounds</u>, Civil Rights Act of 1991, Pub. L. No.

102-166, 105 Stat. 1074, <u>as recognized in</u> <u>Raytheon Co. v.</u>

<u>Hernandez</u>, 540 U.S. 44, 53, 124 S. Ct. 513, 157 L. Ed. 2d 357

(2003).  In a Title VII case, such a showing was insufficient

even to establish a prima facie case.  <u>Id.</u>  If such an imbalance

were sufficient,

> any employer who had a segment of his work
> force that was — for some reason — racially
> imbalanced, could be haled into court and
> forced to engage in the expensive and
> time-consuming task of defending the
> "business necessity" of the methods used to
> select the other members of his work force.
> The only practicable option for many
> employers would be to adopt racial quotas,
> insuring that no portion of their work forces
> deviated in racial composition from the other
> portions thereof; this is a result that
> Congress expressly rejected in drafting Title
> VII.

<u>Id.</u>

In a decision embodying the principles of <u>Wards Cove</u>, the

Ninth Circuit, in <u>Katz v. Regents of the Univ. of Cal.</u>, 229 F.3d

831 (9th Cir. 2000), refused to infer age discrimination from an

action that adversely affected a group that consisted of older

ADEA-protected employees, but not a group of younger employees.

<u>Id.</u> at 835.  The employer extended an early retirement incentive

16

to members of one retirement plan, whose average age was 55, and denied it to members of another plan, whose average age was 60.[10] Id. at 833.  That older employees were subject to worse treatment could not overcome the employer's legitimate reason for the decision.  Id. at 836.  The relevant inquiry, Katz held, was the number of employees over 60 who were adversely affected, compared to the number of employees in that age group who were not.  Id.

The logic of Wards Cove and Katz is applicable to this case. If Plaintiffs had their way, any personnel change that negatively affected a portion of the workforce that shared certain protected characteristics would subject an employer to a lawsuit wherein the plaintiff could, by that fact alone, establish a genuine issue as to whether the employer's explanation was pretextual. To avoid this, employers would be driven to enact quota systems to ensure that no job category contained a predominance of a protected class of employees.  Otherwise, an employer would be virtually powerless to adversely effect such a group, regardless of the business necessity.  It is prudent for the Court to require something more than an adversely affected job category that is predominantly staffed by employees from a protected class.

A comparison of the number of protected individuals companywide with the number of protected individuals affected

---

[10]That the employees not subject to the adverse treatment were also in the ADEA protected class did not affect the court's analysis.  Id. at 835-36.

17

does not support Plaintiffs' claims.  About half of Defendant's 6,000 employees, both presently and in 1997, were over the age of 40.  Pls.' Opp'n to UMF No. 29.  Furthermore, as a result of the 1998 Plan and 1997 Job Study, only 33 of the 63 DOMs experienced a reduction in salary.  Plaintiffs claim that the 33 who were harmed were the "oldest in terms of age and seniority."  Pls.' Opp'n to UMF No. 29.  No facts in the record support this claim.[11]  A sample of 33 employees adversely affected because of their inclusion in a job category, out of thousands of protected individuals companywide, does not support an inference of discriminatory motive.

Plaintiffs also claim that becoming a DOM requires "skills that could not be obtained without age and seniority."  Pls.' DMF No. 52.  This fact gets Plaintiffs no closer to an inference of discriminatory motive.  The Supreme Court has held that even a decision that is explicitly based on years of service is not necessarily "age based."  Hazen Paper, 507 U.S. at 611 ("[A]n employee's age is analytically distinct from his years of service.")  Plaintiffs' argument is essentially the same defective syllogism:  the changes affected DOMs, DOMs tend to be older, and therefore the decision was intended to affect older employees.

Plaintiffs also claim that Defendant deceived DOMs regarding

---

[11]Plaintiffs cite, without a pinpoint citation, to the declarations of Robert Stocker and Raymond Mellen for this seemingly important proposition.  Though "not required to comb the record" for facts opposing summary judgment, the Court reviewed the declarations and found no support for this claim.  See Carmen, 237 F.3d at 1029.

1  the scope of the new compensation plan by telling them that it

2  applied to all managers, not just DOMs.  Plaintiffs refer to the

3  Declaration of Raymond Mellen in support of this claim.  Mellen,

4  who was not a DOM, alleges that his supervisor Steve Lenzi told

5  him that the 1998 Plan applies only to DOMs.[12]  Mellen Decl. at

6  ¶ 5.  Furthermore, a transition plan Defendant implemented to

7  mitigate the adverse affects of the changes in compensation

8  applied only to DOMs.  Mot. Ex. F at 83:3-84:8.  Plaintiffs fail,

9  however, to show that anyone represented to the DOMs that the

10 1998 Plan applied to all managers.  The only evidence Plaintiffs

11 present on this point is that the plan was entitled "the 1998

12 High Performance Plan for Managers."  The Court finds that the

13 title of the plan is insufficient to support an inference that

14 Defendant led DOMs to believe that all managers, not just DOMs,

15 were affected.

16     In any event, it appears to be irrelevant whether Defendant

17 misled DOMs about the scope of the compensation changes.  This is

18 because Plaintiffs have not provided evidence that members of the

19 class Defendants claim were affected, specifically all managers

20 other than Sales Managers, consisted of individuals who were in

21 whole or in part younger than DOMs.  Simply lying about who the

22 compensation change affected could not show that Defendant's

23

24     [12]Defendant asks the Court to exclude Mr. Mellen's statement
   as hearsay not qualifying as an admission of a party opponent.  See
25 Fed. R. Evid. 801(d)(2).  Because the testimony, even if admitted,
   does not permit an inference giving rise to a genuine issue as to
26 a material fact, the Court need not decide its admissibility.

1    proffered reason was a pretext unless it concealed an age bias.
2    The Court finds the absence of a genuine issue concerning whether
3    Defendant misled Plaintiffs about who the compensation changes
4    affected.

5        Plaintiffs argue that discriminatory motive can be inferred
6    because Defendant did not cut DOMs' salary after Plaintiff
7    Williams filed his complaint with the EEOC.  Stocker Decl. at
8    ¶ 29.  For this contention to indicate a discriminatory motive,
9    two further premises must be established:  first, that
10   Defendant's motives for cutting DOM salary still existed at the
11   time of the EEOC action and, second, that the EEOC complaint
12   would only cause Defendant to stop cutting DOMs' salaries if
13   Defendant's motives were discriminatory.  Nothing in the record
14   indicates that Defendant had any plans or inclination to cut
15   DOMs' compensation after the 1998 Plan that the EEOC complaint
16   thwarted.  Furthermore, ceasing compensation cuts in light of an
17   EEOC complaint could be a reasonable action whether or not a
18   discriminatory motive actually existed.  Defendant could just as
19   likely decline to alter compensation as part of a prelitigation
20   strategy whether or not its motives were, in fact,
21   discriminatory.  Defendant's actions following the EEOC complaint
22   are not probative as to its motives for the earlier actions.

23       Because Plaintiffs have failed to produce substantial
24   evidence tending to show discriminatory motive, their disparate
25   treatment claims fail as a matter of law.

26

1        **C.   Disparate Impact Age Discrimination**

2        Disparate impact claims concern "'employment practices that

3   are facially neutral in their treatment of different groups but

4   that in fact fall more harshly on one group than another and

5   cannot be justified by business necessity.'"  Rose, 902 F.2d at

6   1423.  To prevail on a disparate impact claim Plaintiffs must:

7                (1) identify the specific employment
                 practices or selection criteria being
8                challenged; (2) show disparate impact; and
                 (3) prove causation; "that is, the plaintiff
9                must offer statistical evidence of a kind and
                 degree sufficient to show that the practice
10               in question has caused the exclusion of
                 applicants for jobs or promotions because of
11               their membership in a protected group."

12  Rose, 902 F.2d at 1424 (quoting Watson, 487 U.S. at 994-95);

13  Carter v. CB Richard Ellis, Inc., 122 Cal. App. 4th 1313, 1323-24

14  (2004) (citing Watson, 487 U.S. at 994-97) (same test under

15  California law).

16       Defendant does not challenge Plaintiffs' identification of

17  employment practices.  Plaintiffs have specified that the mid-

18  1990s restructuring, the 1997 Job Study, and the 1998 Plan

19  disproportionately affected DOMs.

20       Plaintiffs have made a strong showing of numerically

21  disparate impact.  Specifically, 33 of the 63 DOMs were harmed by

22  the changes associated with the Study and the 1998 Plan and

23  almost all of the DOMs were over 40.  Defendant contends that

24  other managers were also affected by the compensation changes,

25  but no evidence of this appears in the record.  The Court will

26  presume, for the purpose of this motion, that DOMs were the only

21

1   ones affected.  See Matsushita, 475 U.S. 574.  The record

2   indicates that the majority of Defendant's 6,000 employees were

3   in 1997, and currently are, members of the protected class.  This

4   means that 33 protected class members were harmed, while about

5   3,000 were not.  This number is in comparison, however, to a few,

6   perhaps zero, adversely affected nonmembers of the protected

7   class out of about 3,000 total nonmembers.[13]  Plaintiffs have

8   therefore created a genuine issue as to whether employees over 40

9   were more seriously impacted by the compensation changes.

10      Thus, summary judgment will be appropriate on the disparate

11  impact claim only if Plaintiffs fail to offer statistical

12  evidence that creates a genuine issue as to causation.  The

13  causation inquiry concerns whether the challenged practices

14  harmed DOMs "because of" their age.  In making this showing,

15  Plaintiffs face the same problems they did in inferring

16  discriminatory motive from treatment of DOMs as a group.  See

17  III.B.3, supra.

18      Even where older employees are more harshly affected by an

19  employer action, disparate impact liability does not attach

20  "where the differentiation is based on reasonable factors other

21  than age discrimination. . . ."  Smith v. City of Jackson,

22  ___ U.S. ___, 125 S. Ct. 1536, 161 L. Ed. 2d 410, 420 (2005).

23  Such differentiation is permissible because certain circumstances

24  _____

25      [13]The record does not indicate how many DOMs were younger than
    40.  Nor does it specify whether any DOM younger than 40 was
26  adversely affected by the change.

affect older workers, as a group, more strongly than they affect younger workers, yet may nonetheless be reasonable. Id. at 422. In Smith, the Court upheld the employer's decision to raise the salaries of employees with less seniority "for the purpose of bringing salaries in line with" those paid by other employers. Id.

Statistics that show older employees were subjected to adverse employment actions at a higher rate than young employees are insufficient to show causation. Rose, 902 F.2d at 1417. In Rose, a nondiscriminatory factor explained the statistical disparities. Id. The nondiscriminatory factor was that older persons tended to occupy the management positions that the company eliminated as duplicative. Id.

Similarly, in Katz, a finding of disparate impact was inappropriate where plaintiffs failed to show causation. 229 F.3d at 835-36. In that case, plaintiffs proved that the employer's decision disproportionately harmed members of a particular retirement plan, who were older, on average, than those who were not harmed. Id. at 835. The number of employees in the relevant age group who were negatively affected by the employer's action, 238, was small compared to the total number of employees in that age group, 895. Id. at 836. The employer's advancement of a nondiscriminatory reason for the disparity made plaintiffs' group-based statistical showing inadequate. Id.

Plaintiffs provide no evidence that age caused these employment actions other than pointing out that the effects were

23

1  limited to DOMs.  Consequently, Plaintiffs' claim fails unless

2  their statistical data alone are sufficient to create a genuine

3  issue as to whether age caused the DOMs to be disparately

4  impacted.  Defendant has advanced a nondiscriminatory explanation

5  that the record supports:  DOMs were overpaid, and reducing and

6  restructuring their compensation was good business.  Plaintiffs

7  concede that prior the 1997 Study and 1998 Plan, DOMs were paid

8  over market rate.  Pls.' DMF No. 16.  Though Plaintiffs dispute

9  the necessity for and the methodology of the 1997 Study, they

10 cannot show that Defendant decision makers did not or could not

11 rely upon it.  Plaintiffs provide no evidence from which the

12 Court can infer that Defendant's nondiscriminatory explanation is

13 pretextual or unworthy of credence.

14     These group-based statistical data are insufficient to allow

15 an inference that DOMs' age caused any adverse impacts.

16 Plaintiffs have produced evidence from which the trier of fact

17 can infer that Defendant changed its personnel practices in a way

18 that disproportionately affected *DOMs as a group*.  Because

19 becoming a DOM required "skills that could not be obtained

20 without age and seniority" (Pls.' DMF No. 52), individuals in

21 those positions tended to be in the protected class.  As in Rose,

22 none of the employment actions explicitly took into account age.

23 Rather, older persons tend to occupy the category of employees,

24 DOMs, to which these compensation changes applied.  See Rose, 902

25 F.2d at 1417.  Rose and Katz establish that Defendant's actions

26 toward a group that contains older employees do not suffice to

1  establish causation.

2      Furthermore, very few of Defendant's employees over age 40
3  were harmed.  In fact, the ratio of protected individuals who
4  were harmed to protected individuals overall is very small – only
5  33 out of about three thousand, or about 1 percent – even
6  compared with the 238 to 895 ratio that <u>Katz</u> found inadequate.
7  As the Supreme Court has warned, permitting group-based
8  statistics to create a genuine issue as to causation would leave
9  employers no choice but to staff job categories by awkward
10 prophylactic quota systems.  <u>See</u> <u>Wards Cove</u>, 490 U.S. at 652.
11 The Court declines to make such an allowance here.  Plaintiffs'
12 statistics create a genuine issue as to whether *DOM status* caused
13 the compensation changes, but not as to whether *age* caused them.

14     Because Plaintiffs have failed to establish a prima facie
15 case for disparate impact age discrimination, their disparate
16 impact claims fail as a matter of law.

17     Plaintiffs' claims for disparate treatment discrimination
18 and disparate impact discrimination under FEHA and ADEA fail as a
19 matter of law.  Consequently, summary judgment on causes of
20 action one and two is GRANTED.

21     **D.   Constructive Discharge**

22     To recover damages for wrongful termination based on their
23 resignations, Plaintiffs must show that Defendant constructively
24 discharged them.  To prove constructive discharge under

25 //

26 //

25

California law[14] Plaintiffs must show that (1) working conditions
at the time of their resignation were so intolerable or
aggravated that (2) a reasonable person in their position would
have been compelled to resign, and that (3) Defendant either
intentionally created or knowingly permitted the intolerable
working conditions.  King v. AC & R Adver., 65 F.3d 764, 767 (9th
Cir. 1995).  The California Supreme Court has held that the
working conditions must be "sufficiently extraordinary and
egregious" to overcome an employee's normal motivation to remain
on the job.  Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238,
1246 (1994).  Additionally, adverse working conditions must be
"unusually 'aggravated' or amount to a 'continuous pattern'" to
be considered intolerable.  Id. at 1247.

     Plaintiffs allege that a series of adverse employment
actions that caused them to resign amount to constructive
discharge.  Plaintiffs claim they were poised to lose salary and
retirement benefits as a result of Defendant's actions.  Coleman
Decl. at ¶ 4; Stocker Decl. at ¶ 11; Williams Decl. at ¶ 4.
The 1997 Job Study lowered the market rate for DOM compensation
by 12 percent, resulting in a lower pay rate for some DOMs.  Kane
Decl. at ¶ 6.  Other alterations in the pay plan made a
percentage of their salary – 10 percent under the 1995 Plan and
up to 15 percent under the 1998 Plan – depend on their job

---

[14]Because Plaintiffs' ADEA claims fail as a matter of law, the
Court need not decide whether Plaintiffs were constructively
discharged under federal law.

performance and the financial health of the Company.  Kane Decl. at ¶¶ 8-9; Stocker Decl. at ¶ 30.

Plaintiffs also allege that Defendant misled them when it told them that the 1998 Plan applied to all managers, rather than just to DOMs.  Mellen Decl. ¶ 4.  Plaintiffs claim the Company did not stabilize DOMs' salaries in conjunction with the pay changes, even though it had done so in the past to assist other employees whose duties had changed.  Stocker Decl. at ¶ 14.  Mr. Kane did not permit Plaintiff Williams to look for a second job to help ameliorate pay cuts, even though other DOMs were allowed to do so.  Williams Decl. at ¶ 7.  Plaintiffs do not, however, allege that individuals who previously benefitted from pay stabilization or second jobs were younger than Plaintiffs.

Defendant responds that Plaintiffs were not asked to resign and that Plaintiff Williams was even asked to reconsider his decision to resign.  Mot. Ex. A at 40-41; Mot. Ex. C at 64, 68; Mot. Ex. D at 8.  Also, two of the three Plaintiffs had not experienced negative effects on their salaries prior to resignation.  It is undisputed that Plaintiff Williams resigned in anticipation of adverse effects of the changing compensation structure, but before any adverse effects occurred.  Defendant's UMF No. 26.  Furthermore, Plaintiffs do not dispute that Plaintiff Coleman's compensation when he resigned was approximately the same as when the 1998 Plan went into effect. Id.  Plaintiff Stocker's salary decreased under the 1998 Plan. Stocker Decl. at ¶ 11.  Defendant's contention seems to be

27

essentially that the negative effects on Plaintiffs' compensation were for the most part potential, rather than actual.  It is not clear why an actual change in compensation structure that would not manifest its harm until a future date is by that fact not intolerable when implemented.  The series of adverse actions that Plaintiffs allege can really be distilled down to, at most, two or three pay cuts.  Plaintiffs combine with these incidents alleged deception surrounding them and allegedly pretextual reasons given for them, as well as an alleged reluctance of the Company to mitigate the harms these plans cause.

California's stringent language establishing the requirements for constructive discharge makes such a showing difficult.  As a matter of California law, a demotion in job level, combined with a reduction in pay, does not amount to constructive discharge.  Id. at 768 (citing Turner, 7 Cal. 4th at 1247).  In King, the employee alleging age discrimination resigned when he faced a change of employment to at-will status, reduction of his managerial responsibilities, and a reduction in his base salary that was replaced with a bonus program.  Id.  The court noted that "'every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from unreasonably harsh conditions, in excess of those faced by his or her co-workers. He or she is not, however, guaranteed a working environment free of stress.'"  Id. (quoting Turner, 7 Cal. 4th at 1247).  The salary of the King employee decreased from $235,000 to $175,000, while his fixed

bonus of $100,000 was eliminated in favor of a performance-based bonus of up to $160,000.  <u>Id.</u> at 766.  These contentions were insufficient, as a matter of law, to establish constructive discharge.  Id. at 769.

King precludes Plaintiffs' claim that they were constructively discharged.  The employee faced a harsher adverse action than Plaintiffs, losing his former contractual status in favor of at-will employment in addition to ceding responsibilities and losing guaranteed salary in favor or performance bonuses.  <u>Id.</u> at 768.  Under California law, loss of pay and responsibility does not give Plaintiffs the option to simply "quit and sue."  <u>Turner</u>, 7 Cal. 4th at 1246.  <u>King</u> and <u>Turner</u> require them to continue working and challenge the new employment conditions from within.  Therefore, no genuine issue exists as to whether constructive discharge is appropriate under California law, and Defendant's motion for summary judgment with respect to this cause of action is GRANTED.

**E.   Breach of Implied In Fact Employment Contract**

Plaintiffs allege that an implied in fact contract arose with Defendant that encumbered the Company with certain responsibilities.  Plaintiffs claim that Defendant contracted to comply with federal and state statutes, that Defendant had a practice of only terminating for good cause, that Defendant had a policy of progressive discipline, and that Defendant had a policy entailing that if employees' duties change or there is a change in market rates, pay would not be reduced and new positions would

1    be accompanied by written job descriptions.   Complaint at 12-13.

2        Under California Labor Code section 2922, "[a]n employment,

3    having no specified term, may be terminated at the will of either

4    party on notice to the other."   Though "[s]pecial policy

5    considerations" support a presumption of at-will employment, the

6    parties may reach an agreement contrary to the presumption.   Guz

7    v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 335 n. 8, 336 (2000).

8    The contractual understanding may be express or may be implied in

9    fact, "arising from the parties' *conduct* evidencing their actual

10   mutual intent to create such enforceable limitations."   Id. at

11   336 (emphasis in original).

12       In their opposition brief, Plaintiffs advance contractual

13   claims related only to termination.   The Court need not decide

14   whether the parties agreed to an implied in fact contract

15   regarding the circumstances under which Defendant could terminate

16   Plaintiffs.   Plaintiffs were not terminated.   It is undisputed

17   that Plaintiffs' employment ended when they voluntarily resigned

18   their positions.   Pls.' Opp'n to UMF Nos. 3-5.   Further, the

19   Court has found that no genuine issue exists as to whether

20   Plaintiffs were constructively discharged under California law.

21   Therefore, as a matter of law, Defendant could not have breached

22   a contract not to terminate Plaintiffs, or to terminate them only

23   for cause.

24       Plaintiffs' other contractual claims lack merit.   Defendant

25   could not have breached any contract to comply with federal and

26   state statutes because, as the Court has held, Defendant did not

30

violate any employment statutes.  Nor does any evidence in the record permit an inference of an implied in fact contract to refrain from reducing or to stabilize employee salaries.  The only evidence that lends support to such a contention is Plaintiff Stocker's allegations that Defendant "historically had a policy of stabilizing the salary" where an employee's duties changed and that in Mr. Stocker's experience "over 30 years" as a employee, Defendant would only reduce an individual's salary who "requested transfer into a lower classification position." Stocker Decl. at ¶ 14.

These statements do not indicate an "actual mutual intent to create" limitations on Defendant's employment actions.  See Guz, 24 Cal. 4th at 336.  In Guz, even an unwritten policy or practice evidenced in a statement by employer's president that the company terminated workers only with "good reason" or where there was "lack of [available] work" did not support an implied in fact contract.  Id. at 345.  Here, the evidence is less convincing. It merely consists of Plaintiff Stocker's self-interested personal observations of how, to his knowledge, Defendant has conducted its personnel procedures.

Furthermore, where the employer maintains written policies, their terms "must be a central focus of the contractual analysis."  Id.  As early as 1996, Defendant informed its employees that compensation was variable.  A document entitled "Employee Guide to Compensation:  Performance Year 1996+" provides, "Notice:  This compensation plan is subject to change;

1 employees will be notified of any changes that affect them."

2 Mot. Ex. Q at 7.  This provision indicates that Defendant lacked

3 intent to contractually restrict its ability to change employee

4 compensation.  Plaintiffs' speculative and conclusory averments

5 to the contrary are insufficient to create a genuine issue as to

6 this fact.

7     Because no genuine issue exists as to whether Defendant

8 breached an implied in fact contract, summary judgment on this

9 cause of action is GRANTED.

10     **F.   Breach of the Covenant of Good Faith and Fair Dealing**

11     Plaintiffs claim that Defendant breached a covenant implied

12 in their implied in fact contract.  "'Every contract imposes upon

13 each party a duty of good faith and fair dealing in its

14 performance and its enforcement.'"  <u>Foley v. Interactive Data</u>

15 <u>Corp.</u>, 47 Cal. 3d 654, 683 (1988) (quoting Restatement (Second)

16 of Contracts § 205 (1981)).  The implied covenant does not exist

17 "independent of its contractual underpinnings."  <u>Guz</u>, 24 Cal. 4th

18 at 349.

19     Plaintiffs claim that Defendant breached the implied

20 covenant "by unilaterally instituting a discriminatory

21 compensation plan and rebuffing all efforts by Plaintiffs to

22 modify or amend such a discriminatory act."  Complaint at 14.

23 Because it must be based on an existing contract, the  covenant

24 does not limit employer prerogatives beyond what the parties have

25 explicitly or impliedly agreed upon.  <u>Id.</u> at 350.  For the

26 reasons stated above, no implied in fact contract to stabilize or

1  maintain the level of Plaintiffs' compensation exists.

2  Plaintiffs' invocation of the covenant does not create any

3  additional contractual rights.

4      Nor does the record permit an inference that the changes in

5  compensation fall short of good faith and fair dealing under any

6  contract, express or implied.  Defendant did not terminate

7  Plaintiffs, nor did Defendant's actions amount to constructive

8  discharge under California law.  The Court declines to use an

9  implied covenant to extend a purported agreement to terminate for

10  cause to bar an employment action that does not qualify as

11  constructive discharge.  <u>Cf</u>. <u>Guz</u>, 24 Cal. 4th at 349.

12      Defendant has advanced a business justification for its

13  actions that the record supports.  Plaintiffs have not presented,

14  in response, any evidence from the Court can infer bad faith or

15  unfair dealing by Defendant, motivated by age discrimination or

16  otherwise, in structuring DOM compensation.

17      Therefore, summary judgment on this cause of action is

18  GRANTED.

19      **ACCORDINGLY:**

20  1.   The Doe defendants are DISMISSED.

21  2.   Defendant's motion for summary judgment is hereby GRANTED.

22  3.   JUDGMENT FOR DEFENDANT TO BE ENTERED.

23

24      IT IS SO ORDERED.

25  **Dated:  November 1, 2005**          ___**/s/ Robert E. Coyle**___
    810ha4                        UNITED STATES DISTRICT JUDGE
26